# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF KENTUCKY
## Pikeville Division

---

**DANNY JOHNSON,**
**SSN: xxx-xx-xxxx**

**Plaintiff,**

**v.**

**CAROLYN W. COLVIN**
**ACTING COMMISSIONER OF SOCIAL SECURITY**

**Defendant.**

**Action No. 7:16-cv-96-JMH**

---

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

John O. Goss, Esq.
VSB # 17333 (*pro hac vice*)
GOSS & FENTRESS, PLC
735 Newtown Road Suite 100
Norfolk, Virginia 23502
Telephone: (757) 466-1095
E-mail: johngoss@gossandfentress.com
Counsel for Plaintiff


John M. Rosenberg, Esq.
Kentucky Bar # 59979
Pillersdorf, DeRossett & Lane
124 West Court St.
Prestonsburg, KY 41653
Telephone: 606.886.6090
E-mail: jandjrose@suddenlink.net
Counsel for Plaintiff

John S. Osborn, III
Assistant United States Attorney
Attorney for the Defendant
Office of the United States Attorney
260 W. Vine Street
Suite 300
Lexington, KY  40507 1612
Telephone: (859) 685 4812
Facsimile: (859) 233 2533
Email: John.Osborn@usdoj.gov

Evan Smith, Esq.
Appalachian Citizens' Law Center
317 Main Street
Whitesburg, KY 41858
Telephone: (606) 633-3929
E-mail: evan@appalachianlawcenter.org
Counsel for Plaintiff


Erick A. Bowman, Esq.
Kentucky Bar # 87125
Counsel for Plaintiff
GOSS & FENTRESS
735 Newtown Road, Suite 100
Norfolk, Virginia 23510
Telephone: (757) 466-1095
FAX No. (757) 461-4670
ebowman@gossandfentress.com

# CONTENTS

I.  SUMMARY OF THE ARGUMENT …………………………………..…….………… 1

II.  STATEMENT OF JURISDICTION ……………….………..………..…………….……… 4

III.  STANDARD OF REVIEW ……………………………………………..…………… 4

IV.  STATEMENT OF THE ISSUES ……………………………………..…………… 5

V.  STATEMENT OF FACTS ……………………………………………..……..……… 5

    A.  The Commissioner's Investigation of Fault or Similar Fault …………..………………….. 5

    B.  The Redetermination Process ……………………………………………………….. 10

    C.  Plaintiff's Redetermination ……………………………………………….…….. 10

VI.  ARGUMENT ………………………………………………………….…….. 11

    A.  Defendant's interpretation of § 405(u) as expressed in HALLEX I-1-3-25
        violates Plaintiff's due process rights guaranteed by Amendment V
        to the Constitution. …………………………………………………….………… 15

    B.  Defendant's interpretation of § 405(u) as expressed in HALLEX I-1-3-25
        violates the Social Security Act ……………………………………………….. 21

    C.  Defendant's interpretation of § 405(u) as expressed in HALLEX I-1-3-25
        violates the Administrative Procedure Act's requirement that the adjudicator
        not "be responsible to or subject to the supervision or direction of an employee
        or agent engaged in the performance of investigative or prosecuting functions
        for an agency." ……………………………………………………….……….. 30

VII.  CONCLUSION ………………………………………………….………. 32

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF KENTUCKY**

**Pikeville Division**

**Danny Johnson,**
**SSN: xxx-xx-xxxx**

      **Plaintiff,**

**v.**                                                            **Action No. 7:16-cv-57-KKC**

**Carolyn W. Colvin**
**Acting Commissioner of Social Security**

      **Defendant.**

<u>**MEMORANDUM IN SUPPORT OF**</u>
<u>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**</u>

COMES NOW the Plaintiff, Danny Johnson, by counsel and submits the following Memorandum in support of his motion for summary judgment filed in this cause.

## I.     <u>SUMMARY OF THE ARGUMENT</u>

The existence of fraud associated with Plaintiff's application for benefits is now recognized as "a predicate fact without which [the] termination of benefits would not have occurred as it did" (*Carter v Colvin*, Civil Action No. 0:16-017-DCR,  Memorandum Opinion and Order Denying Injunctive Relief, ECF 34 page 15 Note 10).  Why then has that predicate fact never been proven with even a shred of evidence? To be blunt about it, the entire justification for this redetermination process may in fact be based on false presumptions.

How will we know? Defendant has no plans to prove anything in this regard. She urges the Court to accept a process that means that the existence of fraud will never be adjudicated. Nevertheless, she moves deftly past this troublesome issue to disregard *res judicata* and terminate Plaintiff's benefits without any verification of accusations that might justify a legal reopening of the claim. Was there fraud? That will remain forever unlitigated, never proven, and—according to the Defendant—never even subject to question in this court review.

As Defendant would have it, Attorney Eric Conn, the supposed mastermind of the fraud conspiracy, is to be accorded significantly more procedural protection in defending himself than Plaintiff, who Defendant asserts is one of the 1,787 unwitting victims of Conn's fraudulent behavior. Is that the way things should be?

No, it isn't. The Constitution requires that this predicate fact be proven by some appropriately constituted tribunal, where Plaintiff is accorded the fundamental due process right to a fair hearing, at a meaningful time, before an impartial adjudicator. Plaintiff is entitled to be confronted with the evidence that Defendant claims supports the accusations made against her representative, and she gets the opportunity to rebut that evidence exhibited against her. Due process requires no less.

Aside from the constitutional requirement, the Social Security Act declares that the original decision made in Plaintiff's disability claim is a final decision that may only be disturbed in narrowly defined circumstances. The doctrine of *res judicata* is explicitly stated right there in the Act, and accords both the Commissioner and the claimant the fundamental right of repose once the issue of disability has been finally adjudicated. Any relitigation of Plaintiff's claim pursuant to a redetermination mandate must absolutely respect that. There must be a sound

reason – established by substantial evidence acceptable to an impartial adjudicator – to disturb final decisions in disability claims. There has to be more than unproven innuendo.

Finally, an Inspector General charged exclusively with investigatory functions, may not be an adjudicator of any part of a determination of disability. This is a fundamental principal contained in the Administrative Procedure Act that Defendant violates.

The statutory provisions Defendant relies on to justify her actions in this case, 42 U.S.C. §§ 405(u) and 42 U.S.C § 1320a-8(*l*), were indeed enacted to protect the public fisc. Congress intended to establish a new authority for a civil action for assessment of civil penalties against those engaging in patterns of fraudulent conduct; a mandate that the Defendant not wait until the conclusion of civil or criminal proceedings against perpetrators of fraud to administratively reopen and redetermine whether to continue disability payments; and a requirement that the Defendant share information across the divisions of her agency so that all available remedies would be sought as soon as practicable.

But that is all these enactments do. Congress was *not* seeking to remedy a lack of administrative protocols for reopening administrative decisions where fraud was suspected. Proper regulatory authority already existed by which Defendant could act. Those due process regulations are explicitly referred to in the legislative history of these enactments as the mechanism by which 405(u) redeterminations were to occur. Congress was demonstrably aggravated not by a lack of process, but by a slothfulness on the part of the Social Security Administration's bureaucracy in undertaking to use the reopening mechanisms already in place to protect the funds entrusted to the agency. What 405(u) intended was to require the agency to use existing authority to act - *and use it "immediately"* - to determine whether there was in fact

fraud that was causing benefits to continue to be improperly paid out so that payments could be terminated.

The legislation was never intended to do away with Plaintiff's right to fundamental due process in the investigation and redetermination of eligibility for the benefits she was awarded some years ago, or to do away with *res judicata*. It was never intended to create a Kafkaesque protocol where an investigator's suspicions of misconduct – whether real or imagined - do not need to be grounded in demonstrable reality, or even to have been objectively reasonable to begin with.

## II.       STATEMENT OF JURISDICTION

This Court has jurisdiction of this matter pursuant to the provisions of 42 U.S.C. Section 405(g) which provides for judicial review by this Court of the defendant's final decision that denied the plaintiff a period of disability and Social Security disability insurance benefits.

## III.      STANDARD OF REVIEW

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show "that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party has the initial burden of proving that no genuine issue of material fact exists," and the court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2001). When a motion for summary judgment is properly made and supported and the nonmoving party

fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## IV.    STATEMENT OF THE ISSUES

1.    Whether Defendant's interpretation of § 405(u) as expressed in HALLEX I-1-3-25 violates Plaintiff's due process rights guaranteed by Amendment V to the Constitution.

2.    Whether Defendant's interpretation of § 405(u) as expressed in HALLEX I-1-3-25 violates the Social Security Act.

3.    Whether Defendant's interpretation of § 405(u) as expressed in HALLEX I-1-3-25 violates the Administrative Procedure Act's requirement that the adjudicator not "be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency."

## V.    STATEMENT OF FACTS

### A.    THE COMMISSIONER'S INVESTIGATION OF FAULT OR SIMILAR FAULT

The history of these redeterminations begins during a period of stress on the Social Security Administration caused by an enormous backlog of unadjudicated claims that had built up in the years after 2000.  Agency efforts to work through the claim backlog were met with fraud allegations asserted by various committees of the United States Congress that were displeased with what were deemed excessive benefit payment rates.  The allegations were then pursued in conjunction with the Social Security Administration's Office of the Inspector General (OIG).  These events are detailed in the following paragraphs.

### 1.     Pressure by SSA on ALJs Due To Backlog

During the years leading up to 2007, SSA primarily focused on processing a backlog of claims that had reached historic proportions.  Then-Commissioner Michael J. Astrue addressed this increasingly desperate situation during his term by pursuing a variety of efficiencies in the processing of cases at all levels of operations.  SSA sought to increase its adjudicatory capacity by putting in place performance goals, urging that ALJs strive to issue 500 to 700 legally sufficient decisions a year.  At that time only half of the ALJs were meeting this performance goal.  Accordingly, SSA began pressuring ALJs to do more.  *Eliminating the Social Security Disability Backlog: Hearing Before the Committee on Ways and Means,* 111th Cong. 12-73 (2009) (statement of Michael J. Astrue, Commissioner, U.S. Social Security Administration).

One of Commissioner Astrue's specific proposals was to have judges review cases in their respective hearing offices that were "unpulled."  Unpulled cases are newly arrived cases that are not prepared for hearing because staff had yet to engage in the months-long process of selecting documents from the original claim file and organizing and indexing them into an administrative record.  ALJs were asked to review those newer cases to see if there were any that could be decided on the record (OTR) with a view to saving staff resources.  OTR decisions are uniformly favorable, because an ALJ cannot issue an unfavorable decision without a hearing except in very rare cases.  Over the years, prescreening new cases for OTR possibilities has periodically been emphasized or de-emphasized in a pattern that is generally based on case backlog trends.  *See* Statement of Michael J. Astrue, *supra*.

After these performance goals were established, Chief ALJ Charlie Andrus of the Huntington, West Virginia ODAR authored a plan for his own office to improve productivity in

accordance with agency directives.  Chief ALJ Andrus told all of the judges in the Huntington office that if any of them felt that they had the time, to go to the master docket (the docket of unpulled cases) and review cases that had not yet been assigned for hearing for possible OTR decisions.  Judge Daugherty was one ALJ who did undertake such a review effort.  Eric C. Conn was one of three or four attorneys who worked with Judge Daugherty identifying possible OTR cases and obtaining supplemental evidence for him to review for possible OTRs.  *Social Security Disability Benefits: Did a Group of Judges, Doctors, and Lawyers Abuse Programs for the Country's Most Vulnerable: Hearing Before the Committee on Homeland Security and Governmental Affairs,* 113 Cong. 69-89 (2013) (testimony of Charlie P. Andrus, Administrative Law Judge, U.S. Social Security Administration).  Predictably, Judge Daugherty had a high benefit payment rate.

### 2.    Allegations of Fraud In Kentucky

On May 19, 2011, The Wall Street Journal, published an expose-style article about ALJ Daugherty and Attorney Eric C. Conn.  *See* Damian Paletta, *Disability-Claim Judge Has Trouble Saying 'No': Near Perfect Approval Record; Social-Security Program Strained,* The Wall Street Journal (May 19, 2011) available at http://www.wsj.com/articles/SB10001424052748 704681904576319163605918524.

In a June 16, 2011 letter, members of the Social Security Subcommittee of the House of Representatives Committee on Ways and Means requested that SSA's OIG provide information on ALJs who were significant "outliers" either in terms of their productivity or their decisional outcomes.  OIG's study found that ALJs it spoke to mentioned that peers who felt pressured to meet the 500 to 700 disposition benchmark may have allowed more cases because allowances

are easier to process than denials.  *See* OIG Report A-12-11-01138 (Feb. 14, 2012) <u>available at</u>

http://oig.ssa.gov/audits-and-investigations/audit-reports/A-12-11-01138.

In September 2012, the Minority Staff of the U.S. Senate Permanent Subcommittee on Investigations issued a report alleging that information had emerged that a few ALJs issued and approved cases at levels far higher than their peers.   The report specifically named ALJ Daugherty as one of these ALJs.  *See* Minority Staff Report, U.S. Senate Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, *Social Security Disability Programs: Improving the Quality of Benefit Award Decisions* (Sept. 13, 2012), <u>available at</u> http://hsgac.senate.gov/subcommittees/investigations/ hearings/social-security-administrations-disability-programs.

On October 7, 2013, the United States Senate Committee on Homeland Security and Governmental Affairs held a hearing.  *Social Security Disability Benefits: Did a Group of Judges, Doctors, and Lawyers Abuse Programs for the Country's Most Vulnerable: Hearing Before the Committee on Homeland Security and Governmental Affairs,* 113 Cong. (2013).  The Committee issued a written staff report thereafter.  The title of the report is "How Some Legal, Medical, and Judicial Professionals Abused Social Security Disability Programs for the Country's Most Vulnerable: A Case Study of the Conn Law Firm."  *Id* at 171.  In the report, a number of accusations of fraud were made against both ALJ Daugherty and Eric C. Conn. Witnesses at the October 7, 2013 hearing included Chief ALJ Andrus, who testified about his actions described above.  Two of four doctors the Committee identified as participating in fraudulent conduct—Bradley Adkins, Ph.D. and Srinivas Ammisetty, M.D.—testified at the hearing.  Another doctor so identified—Frederic Huffnagle, M.D.—did not testify because he

died in 2010.  The final doctor—David P. Herr, D.O.—declined to testify, as did ALJ Daugherty and attorney Eric C. Conn.

### 3.     SSA Decides To Redetermine Benefits Based On "Similar Fault"

On October 7, 2013, Debra Bice, Chief Administrative Law Judge of the SSA, informed the Senate Committee on Homeland Security and Government Affairs that the agency now had what she termed "reliable evidence" that certain cases contained pre-completed forms without an independent review of findings.   Bice declared that her information was sufficient to show "similar fault" under the Social Security Act.  113 Cong. at 124.

Bice announced that, based on this information, SSA could redetermine these cases.  The agency would commence to review the affected cases, disregarding what she termed "the tainted medical evidence."  Then, if the truncated record did not support the original allowance, SSA would provide the beneficiary notice of its completed action and provide the opportunity to submit additional medical evidence before making a final determination on the beneficiary's disability eligibility.  Beneficiaries would receive notification at the point that SSA terminated their benefits and assessed an overpayment.  Bice said that SSA was already in the process of identifying and reviewing cases.   SSA commenced this process without notice to affected beneficiaries or an opportunity for them to submit evidence or be heard in any respect on the issue of similar fault at this stage of the proceedings.  *Id.*

SSA has never disclosed the "reliable evidence" that Bice referred to in her statement. Instead, the agency completed its internal secret review by issuing notices to benefit recipients in May 2015 stating that the SSA was redetermining their disability benefits, as explained in further detail below.

B.     THE REDETERMINATION PROCESS

On July 2, 2014, SSA OIG, claiming to act under the authority of 42 U.S.C. § 1320a-8(l), provided SSA with information regarding 1,787 individuals.  These individuals were formerly represented by attorney Eric C. Conn, or his firm, and OIG asserted that it had reason to believe that fraud was involved in their applications for Social Security benefits.  According to a later memorandum (discussed below), OIG indicated that it understood that SSA would use this information to carry out its responsibilities to redetermine cases involving fraud or similar fault under 42 U.S.C. §§ 405(u) & 1383(e)(7)(A)(i), but that this referral was made with the understanding that SSA was not to take any adverse action against any individual on the list until further notice.

Through a May 12, 2015 memorandum from Helen L. Cooper (Acting Counsel to the OIG) to David F. Black (General Counsel of OIG), OIG indicated that it was not aware of any objections to SSA moving forward with its administrative processing of the redeterminations of the 1,787 individuals whose names were previously provided by OIG to SSA, and informed SSA that it could proceed with its redetermination of the cases of the individuals on the previously transmitted list.  The original referral (i.e., the referral of July 2, 2014) remains secret.

C.     PLANTIFF'S REDETERMINATION.

Plaintiff filed an application for a period of disability and disability insurance benefits, and an application for Supplemental Security Income, on March 30, 2006, alleging an onset of disability of August 15, 2004 due to degenerative disc disease of the lumbar spine and cervical spine. Plaintiff's' application was initially denied and, upon reconsideration by the Social Security Administration, was again denied, whereupon Plaintiff timely requested a hearing before an administrative law judge. Plaintiff hired Attorney Eric C. Conn to represent him. (Tr.

75). Mr. Conn engaged the services of Dr. Frederic T. Huffnagle to examine Plaintiff and give an examination report. The report was submitted into evidence. (Tr. 588-594).

In a decision dated February April 4, 2007 an administrative law judge of the Social Security Administration's Office of Disability Adjudication and Review issued a decision that found that the plaintiff was entitled to a period of disability and disability insurance benefits and Supplemental Security Income under the Social Security Act beginning August 15, 2004. Plaintiff received benefits in accordance with that decision. (Tr. 71-79)

In a letter dated May 18, 2015, the Appeals Council of the Social Security Administration notified Plaintiff that the Defendant was going to redetermine Plaintiff's entitlement to benefits awarded by the previous decision of the administrative law judge, and that a new administrative law judge would be disregarding certain evidence presented and received into the record without objection in the prior decision. (Tr. 101-107). After a preliminary review was completed at the Appeals Council level, the case was remanded to a new administrative law judge with instructions included in a remand order dated July 29, 2015. (TR. 81-85)

Plaintiff appeared at a hearing before an administrative law judge of the Social Security Administration's Office of Disability Adjudication and Review held on November 13, 2015, Following that hearing, the administrative law judge issued a decision that found that the plaintiff was not entitled to a period of disability or disability insurance benefits under the Social Security Act from the alleged onset date through the date of the original decision of the previous administrative law judge. (Tr. 6-25). Following the decision of the administrative law judge, the plaintiff timely requested review by the Appeals Council of the Social Security Administration's Office of Disability Adjudication and Review.  The Appeals Council denied the plaintiff's request for review of the administrative law judge's decision in a written decision dated March

22, 2016. (Tr.1)  The decision of the administrative law judge now stands as the final decision of the defendant.

## VI.    ARGUMENT

42 U.S.C.§ 405(u) reads in pertinent part as follows:

> (1)(A) The Commissioner of Social Security shall immediately redetermine the entitlement of individuals to monthly insurance benefits under this subchapter if there is reason to believe that fraud or similar fault was involved in the application of the individual for such benefits . . . .

> (B) When redetermining the entitlement, or making an initial determination of entitlement, of an individual under this subchapter, the Commissioner of Social Security shall disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence.

Defendant argues in her Motion to Dismiss (ECF 16) that she is simply executing the mandate of 42 U.S.C. § 405(u), and that none of her previously promulgated regulations apply to these "redeterminations". Contrary to Defendant's assertions, § 405(u) is no more self-executing without regulatory elaboration than the rest of the Social Security Act is. § 405(u) makes no provision for "procedures, not inconsistent with the provisions of this subchapter, which are necessary or appropriate" to carry it out and does not "regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits". See 42 U.S.C. § 405(a). Obviously, more is needed to effectuate the statute.

To meet the need, Defendant adopted HALLEX I-1-3-25 and the further explanatory Social Security Rulings 16-1p and 16-2p as her agency interpretation of § 405(u), and Plaintiff's redetermination was adjudicated pursuant to the procedures contained in HALLEX I-1-3-25.

HALLEX I-1-3-25[1], not published until February of this year, is titled "Processing Cases Under Sections 205(u) and 1631(e)(7) of the Social Security Act (Fraud or Similar Fault 'Redeterminations')."

HALLEX I-1-3-25 somewhat arbitrarily establishes one procedure for redeterminations that are undertaken initially by SSA's Office of Adjudication Review (ODAR) directly, and another for those that are undertaken when ODAR receives a referral from the Office of the Inspector General (OIG). The Commissioner has stated that the current redeterminations are in fact the result of an OIG referral, so those provisions of HALLEX I-1-3-25 were followed in Plaintiff's redetermination. The applicable features of the rule are:

1. Where a group of cases involves the same source believed to have committed fraud or similar fault, ODAR is to draft specific procedural instructions. These procedures become a HALLEX temporary instruction (TI). It addresses the factual and legal basis for conducting the redetermination and describes the evidence SSA will disregard. In cases where there is an ongoing criminal investigation, this TI itself remains secret.

2. SSA provides the targeted benefit recipients only a summary of investigative findings, as well the OIG §1129(l) referral, with the OIG referral notice placed in their claim files. Thus the targeted benefit recipients never see the evidence used against them.

3. The Inspector General's findings based on this undisclosed evidence are final. The claimant is never accorded an opportunity to challenge the decision to undertake the redetermination, or the decision to exclude relevant and material evidence from consideration. ALJs do not have discretion to revisit the issue of whether the OIG's identified evidence should be disregarded when based on an OIG referral of information.

---

1 HALLEX I-1-3-25 is available at < https://www.ssa.gov/OP_Home/hallex/I-01/I-1-3-25.html>. HALLEX is the acronym for the *Social Security Administration Hearings, Appeals and Litigation Law manual*. HALLEX defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the hearing, Appeals Council, and civil action levels. HALLEX rules are not promulgated through Administrative Procedure Act rulemaking procedures and do not have the force of duly enacted statutes or promulgated regulations contained in the Code of Federal Regulations.

Because HALLEX I-1-3-25 is the rule by which Defendant purports to comply with the requirements of 405(a) and so provide for the "nature and extent of the proofs and evidence and the method of taking and furnishing the same" in order to establish the right to benefits in 405(u) redeterminations, it must survive both constitutional and statutory scrutiny. And because the procedures that Defendant actually utilized in making Plaintiff's redetermination decision are precisely those spelled out in HALLEX I-1-3-25, the legality of the ruling is part and parcel of what the Court must decide in reviewing Defendant's final decision terminating benefits. For the multitude of reasons that follow, these HALLEX procedures – which is to say Defendant's interpretation of § 405(u) and her actions taken pursuant thereto - fail to pass legal muster.

Plaintiff's core contentions are that (1) regardless of whether the findings required by the redetermination process are made by OIG or by ODAR through its ALJs, at some point in the redetermination process—and *before* any relevant evidence is excluded— Plaintiff must be given an opportunity to challenge and rebut the evidence of fraud in her case before a neutral adjudicator; (2) that if fraud is not proven to the satisfaction of a neutral adjudicator based on substantial evidence, *res judicata* requires that the original decision that Plaintiff is disabled remains the final decision in the case; and (3 that OIG as the Defendant's investigative arm is not the proper neutral adjudicator to make *any* of the determinations of fraud or similar fault in redetermination cases, because that violates clear restrictions contained in the Administrative Procedure Act calling for separation of investigative and adjudicatory agency functions.

A.  **DEFENDANT'S INTERPRETATION OF § 405(U) AS EXPRESSED IN HALLEX I-1-3-25 VIOLATES PLAINTIFF'S DUE PROCESS RIGHTS GUARANTEED BY AMENDMENT V TO THE CONSTITUTION.**

In accordance with its plain language, § 405(u) requires a sequence of three determinations:

1.      First, someone in SSA must decide that evidence shows there is reason to believe fraud or similar fault was involved in a beneficiary's application for benefits.

2.      Next, someone must identify the fraudulent evidence and direct its exclusion from consideration.

3.      Finally, someone must redetermine the claim without considering the allegedly tainted evidence.

The question naturally and immediately arises as to exactly who makes these sequential determinations with their requisite findings of fact. The second question is what procedural protections are accorded a beneficiary at each level of the redetermination?

The term "reason to believe" is highly problematic when interpreting § 405(u). This "reason to believe" language has been used in other regulatory legislation, and is interpreted to describe only a threshold determination to begin an adjudication, and not an agency's finding with respect to the matter to be adjudicated. In *Standard Oil Co. of Ca. v. F.T.C.*, 449 U.S. 232 (1980), the issue was whether a complaint averring that the Commission had "reason to believe" that the companies were violating 5 of the Federal Trade Commission Act was a final agency action subject to immediate judicial review under the APA. The Court held that it was not, because:

> [T]he Commission's averment of "reason to believe" that Socal was violating the Act is not a definitive statement of position.  It represents a threshold determination that further inquiry is warranted and that a complaint should initiate proceedings.  To be sure, the issuance of the complaint is definitive on the

question whether the Commission avers reason to believe that the respondent to the complaint is violating the Act. But the extent to which the respondent may challenge the complaint and its charges proves that the averment of reason to believe is not "definitive". . . .

. . . .

[T]he *averment of reason to believe* is a prerequisite to a definitive agency position on the question whether Socal violated the Act, but *itself is a determination only that adjudicatory proceedings will commence.*

*Id.* at 241. [emphasis added].

In the same way, an OIG referral by its terms is not intended to be a "definitive agency position" that fraud has been found to exist.  By definition, an OIG referral is a charging document just like the complaint in *Standard Oil.* As the Defendant's own internal guidelines explain, "unless otherwise noted in the referral, OIG referrals are merely allegations and do not imply or establish any findings. It is ODAR's responsibility to promptly investigate the allegation, determine its validity, and pursue the appropriate course of action." HALLEX I-1-3-12. In other words, without more in the nature of supporting evidence and fact-finding on the merits of the averments, these referrals may not be considered the definitive agency position that permits reopening final decisions in disability claims.

*But the OIG referral, as it used by HALLEX I-1-3-25, is nonetheless treated as the agency's definitive statement of position - the sole non-reviewable predicate finding for reopening and overturning final decisions in these disability claims*. It is as though in a criminal case the law proceeded directly from indictment to sentencing. What happened to the trial? Is that fair? Is it even legal?

When Congress requires an agency to establish a procedure, it can be assumed that Congress intends that procedure to be a fair one. *Marincas v. Lewis*, 92 F.3d 195 (3rd Cir 1996).

See also *Califano v. Yamasaki*, 442 U.S. 682, 693, 99 S.Ct. 2545, 2553-54, 61 L.Ed.2d 176 (1979) (assuming "a congressional solicitude for fair procedure, absent explicit statutory language to the contrary"). Due process is the standard by which fairness is judged.

The analysis of procedural due process claims—as announced in the seminal case of *Goldberg v. Kelly*, 397 U.S. 254 (1970) and subsequently clarified in *Mathews v. Eldridge*, 424 U.S. 319 (1976)—is a two-step inquiry. First, the court determines whether the plaintiff has a protected liberty or property interest sufficient to invoke the protections of Due Process. Second, the court assesses whether the procedures in issue are sufficient to satisfy due process. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam). The first step is easily satisfied here as disability terminations are a recognized "property interest" protected by the Fifth Amendment." *Eldridge*, 424 U.S. at 332–33. The analysis thus turns on the second step.

The second step of procedural due process analysis is generally guided by the balancing test articulated in *Eldridge*, *see supra*. There is, however, a set of minimum due process protections that cannot be balanced away.

> For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.

*Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (plurality op.) (internal quotation marks omitted). "These essential constitutional promises may not be eroded." *Id.*

The "meaningful manner" for benefits cases like this was defined in *Goldberg*, 397 U.S. at 267, and subsequent cases as having the following features:

• It is an immutable principle of jurisprudence that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue."

• The beneficiary "must therefore be given an opportunity to confront and cross-examine the witnesses relied on by the department."

• "The decisionmaker's conclusion as to a recipient's eligibility must rest solely on the legal rules and evidence adduced at the hearing."

*Goldberg*, 397 U.S. at 270-271; *see also Hamdi*, 542 U.S. at 533 (describing "notice of the factual basis" and "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker" as minimum protections (and collecting cases)).

The critical threshold determination of whether there was fraud or similar fault in the original application for benefits (or whether there was a reasonable basis to suspect fraud) is one that must be made according to some process that accords claimants fundamental due process. There must also be substantial evidence to support it. In *Califano*, supra, the Supreme Court dealt with using fault as a legal standard in the context of waiver of overpayment provisions contained in the Social Security Act. Under the regulations, a claimant must be held to have been "without fault" in causing an overpayment to be entitled to a waiver. The Supreme Court stated that:

> The Court previously has noted that a "broad 'fault' standard is inherently subject to factual determination and adversarial input." *Mitchell v. W. T. Grant Co., 416 U.S. 600, 617 (1974)*. As the Secretary's regulations make clear, "fault" depends on an evaluation of "all pertinent circumstances" including the recipient's "intelligence . . . and physical and mental condition" as well as his good faith.  We do not see how these can be evaluated absent personal contact between the recipient and the person who decides his case.  Evaluating fault, like judging detrimental reliance, usually requires an assessment of the recipient's credibility, and written submissions are a particularly inappropriate way to distinguish a genuine hard luck story from a fabricated tall tale.

*Califano, supra*  442 U.S. 682 at 696-697, citing *Goldberg, supra*. The Court held that the Due Process Clause of the Fifth Amendment required that the recipient be given an oral hearing and formal adjudication because the issue was one of fault on the part of the benefit recipient. Social Security Ruling SSR 16–1p[2] acknowledges that determining issues of fraud or similar fault in redetermination cases calls for the same type of inquiry into credibility in the weighing of evidence as does determining whether a claimant qualifies for a waiver of overpayment of benefits.[3]

If the OIG referral is the agency's definitive position, then fault would have to have been established as fact at some point by someone somewhere in OIG. Did OIG hold a hearing? If so, Plaintiff wasn't invited. And evidence? None is deemed necessary under the terms of HALLEX I-1-3-25. Defendant appears to have delegated the finding of fraud to her Inspector General, who then convenes what has been termed a Star Chamber proceeding to determine fault. *Hicks v. Colvin,* Civil No. 16-154-ART (EDKY 2016).

This approach has been repudiated before. In *Interstate Commerce Commission v. Louisville & N. R. Co.*, 227 U.S. 88 (cited in *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970)), the

---

2. Social Security Rulings make available to the public a series of precedential decisions relating to Federal old-age, survivors, disability, supplemental security income, and black lung benefits programs. Social Security Rulings may be based on case decisions made at all administrative levels of adjudication, Federal court decisions, Commissioner's decisions, opinions of the Office of the General Counsel, and other policy interpretations of the law and regulations.

3.  Social Security Ruling SSR 16–1p provides the following: 1. Fraud. Fraud exists when a person, with the intent to defraud, either makes or causes to be made, a false statement or misrepresentation of a material fact for use in determining rights under the Social Security Act; or conceals or fails to disclose a material fact for use in determining rights under the Social Security Act. 2. Similar Fault. As defined in sections 205(u)(2) and 1631(e)(7)(B) of the Act, similar fault is involved with respect to a determination if: ''(A) an incorrect or incomplete statement that is material to the determination is knowingly made; or (B) information that is material to the determination is knowingly concealed.'' . . . . 4. Knowingly. This term describes a person's awareness or understanding  regarding the correctness or completeness of the information he or she provides us, or the materiality of the information he or she conceals from us.

agency argued that, because rates established under the Hepburn Act of 1906 could be set aside if, after a hearing, the "Commission shall be of the opinion that the charge was unreasonable", the order based on such opinion was conclusive, and could not be set aside, even if the finding was wholly without substantial evidence to support it. The Court disagreed, stating:

> A finding without evidence is arbitrary and baseless. And if the Government's contention is correct, it would mean that the Commission had a power possessed by no other officer, administrative body, or tribunal under our Government. It would mean that where rights depended upon facts, the Commission could disregard all rules of evidence, and capriciously make findings by administrative fiat. Such authority, however beneficently exercised in one case, could be injuriously exerted in another; is inconsistent with rational justice, and comes under the Constitution's condemnation of all arbitrary exercise of power.

Looking at the matter another way, by not requiring any evidence on the issue of fraud in the redetermination process, Defendant interprets 405(u) to have created a *presumption* as to its existence. Further, by not allowing the existence of fraud to be challenged by the beneficiary, the presumption is irrebuttable. That also violates the minimum protections of the constitution, as the Supreme Court has explained:

> Statutes creating permanent irrebuttable presumptions have long been disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments. In *Heiner v. Donnan*, 285 U.S. 312 (1932), the Court was faced with a constitutional challenge to a federal statute that created a conclusive presumption that gifts made within two years prior to the donor's death were made in contemplation of death, thus requiring payment by his estate of a higher tax. In holding that this irrefutable assumption was so arbitrary and unreasonable as to deprive the taxpayer of his property without due process of law, the Court stated that it had "held more than once that *a statute creating a presumption which operates to deny a fair opportunity to rebut it violates the due process clause of the Fourteenth Amendment."*

*Vlandis v. Kline*, 412 U.S. 441, 446 (1973) [emphasis added].  See also *Hamdi*, 542 U.S. at 537 ("Any process in which the Executive's factual assertions go wholly unchallenged or are

simply presumed correct without any opportunity for the alleged combatant to demonstrate otherwise falls constitutionally short.").

Defendant's interpretation of § 405(u) as expressed in HALLEX I-1-3-25 falls woefully constitutionally short.

**B. DEFENDANT'S INTERPRETATION OF § 405(U) AS EXPRESSED IN HALLEX I-1-3-25 VIOLATES THE SOCIAL SECURITY ACT.**

As can be seen, the most serious problem with Defendant's interpretation of 42 U.S.C. § 405(u) is that her version of how the statue works renders it unconstitutional. The question then becomes whether the statute can be interpreted in some other manner that would render it constitutional. Plaintiff suggests that this may be possible by applying pertinent canons of statutory construction and reviewing the legislative history of § 405(u). The Court must also decide what deference should be accorded the agency interpretation.

**Statutory Construction.**

Because it is one part of a larger code section, a true understanding of § 405(u) sufficient to allow the Court to determine how it was intended to be used requires context. That this is necessary to gleaning the meaning of a statute was reaffirmed quite recently by Supreme Court Chief Justice Roberts, writing for the Court in *King v. Burwell*:

> If the statutory language is plain, we must enforce it according to its terms. But oftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. So when deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme. Our duty, after all, is to construe statutes, not isolated provisions.

*Supra*, 135 S. Ct. 2480, 2489, 192 L. Ed. 2d 483 (2015). (internal quotation marks omitted). See also *Util. Air Regulatory Grp. v. E.P.A.*, 134 S. Ct. 2427, 2441, 189 L. Ed. 2d 372 (2014) (Scalia, J., for the Court, citing *Brown & Williamson*, 529 U.S., at 132, 120 S.Ct. 1291) ("But we, and EPA, must do our best, bearing in mind the " 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.' ").

**The statutory scheme: 42 U.S.C §1320a-8(1), 42 U.S.C. § 405(u) and 42 U.S.C. § 405**

42 U.S.C. § 405(u), is the companion statute to 42 U.S.C §1320a-8(1). Together, they call for agency action in the event fraud is suspected in disability claims. 42 U.S.C §1320a-8(1) is the primary vehicle. It establishes civil penalties for persons committing fraud in connection with applications for disability benefits. It assesses civil money penalties of not more than $5,000 for each fraudulent statement or representation and assessments of not more than twice the amount of benefits or payments paid as a result of such a statement or representation. §1320a-8(1) provides that The Commissioner of Social Security may initiate a proceeding to determine whether to impose a civil money penalty or assessment as authorized by the Attorney General pursuant to agreed procedures. The statute also requires information sharing between OIG and the rest of the agency. §1320a-8(1) does not, however, call for the reopening of the administrative decisions that awarded benefits. That is taken care of by subsection (u) being added to 42 U.S.C. §405.

42 U.S.C. § 405, in which § 405(u) is placed, is the key provision of the Social Security Act that provides for evidence and procedures in the determinations of disability claims. 42 U.S.C. § 405 contains subsections (a) through (u). Procedural rights are set forth in 42 U.S.C.

§405(b)(1). This subsection of § 405 is titled in part "Administrative determination of entitlement to benefits. . ." and provides that:

- Any decision by the Commissioner of Social Security which involves a *determination of disability* and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based;

- For any applicant whose rights may be prejudiced by any decision the Commissioner of Social Security has rendered, the Commissioner shall give such applicant and such other individual reasonable *notice and opportunity for a hearing* with respect to such decision;

- And, if a hearing is held, the adjudicator shall, *on the basis of evidence adduced at the hearing*, affirm, modify, or reverse the Commissioner's findings of fact and such decision.

A § 405(u) redetermination of disability is a determination of disability that is subject to the requirements of § 405(b)(1). While Defendant claims that a redetermination of disability is different in kind from other determinations of disability, there is no reason in the English language why this would be so. *Merriam-Webster* defines the word "determine" as "to officially decide (something) especially because of evidence or facts: to establish (something) exactly or with authority". The *Oxford Dictionary* defines the word "redetermine" as to "determine (something) again or differently." Nothing in the definitions of the words creates the distinction Defendant would have us believe exists. Neither do we see the usual statutory language one would expect if the intent of § 405(u) was to make the rest of § 405 *not* applicable to it. If § 405(u) were intended to be read separate and apart from the other sections of the legislative

scheme as some new breed of process, and not be a determination of disability as defined generally in the same code section, a customary drafting convention such as "notwithstanding any other provisions of the Act. . . " would have been placed in it. There is no indication whatsoever that § 405(u) should be interpreted as Defendant would have it.

It is clear that under § 405(b)(1) Plaintiff is entitled to a formal hearing with respect to Defendant's decision to terminate her benefits based on a redetermination of her original application. The adjudicator is also required to render a decision affirming, modifying, or reversing Defendant's findings of fact on which her decision is based strictly on the basis of evidence adduced at the hearing. But HALLEX I-1-3-25 provides for no hearing on the fundamental predicate issue of fraud, so no evidence appears in this record to support any finding with respect to fraud.

**Res judicata.**

Courts have traditionally applied *res judicata* to decisions by administrative agencies when a final judgment has been reached. "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose." *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422, 16 L. Ed. 2d 642, 86 S. Ct. 1545 (1966). 42 U.S.C. § 405(h) makes the general rule explicit in disability determinations by providing that the findings and decisions of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing.

The Sixth Circuit, citing *Lively v. Secretary of Health & Human Servs.*, 820 F.2d 1391 (4th Cir. 1987), declared the applicability of *res judicata* to disability determinations in the case of *Drummond v. Commissioner of Social Sec.*

> We find the reasoning of the *Lively* court persuasive. Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ. We reject the Commissioner's contention that the Social Security Administration has unfettered discretion to reexamine issues previously determined absent new and additional evidence. To allow the Commissioner such freedom would contravene the reasoning behind 42 U.S.C. § 405(h) which requires finality in the decisions of social security claimants. Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner.

*Drummond v. Commissioner of Social Sec.*, 126 F.3d 837  (6th Cir. 1997). See also *Miranda v. Secretary of Health, Education & Welfare*, 514 F.2d 996  (1st Cir 1975)(" [O]nce having found a disability, the Secretary may not terminate the benefits without substantial evidence to justify so doing. It would be wrong for the Secretary to terminate an earlier finding of disability on no basis other than his reappraisal of the earlier evidence.").

The thrust of *Drummond*, *Lively* and *Miranda* is that, unless there are new or changed circumstances of some sort, Defendant cannot simply relitigate a previous decision that has become final. This makes the doctrine of *res judicata* an integral part of the constraints under which Defendant must operate when redetermining disability.

There are two recognized instances in which a new adjudication may be appropriate. The most common is where there is evidence of improvement in a beneficiary's condition such that he or she may no longer be disabled. Determining whether this is so is the purpose of continuing disability reviews under 42 U.S.C. § 425. Defendant is not arguing medical improvement, so we move to the second instance where *res judicata* may not bar a redetermination of disability.

**Reopening of final decisions.**

The second exception to the application of *res judicata* to final decisions in disability claims is where there may be no change in circumstances, but where there is *new evidence* that may affect the previous decision.  To have a final decision redetermined and revised after an ALJ decision has become final, it must be reopened.  Under the current regulations, a final decision may be reopened only pursuant to 20 C.F.R. § 404-987(b), which provides:

 (b) *Procedure for reopening and revision*. We may reopen a final determination or decision on our own initiative, or you may ask that a final determination or a decision to which you were a party be reopened. In either instance, if we reopen the determination or decision, we may revise that determination or decision. The conditions under which we may reopen a previous determination or decision, either on our own initiative or at your request, are explained in § 404.988.

20 C.F.R. § 404.988 sets forth the conditions for reopening:

*Conditions for reopening.*

A determination, revised determination, decision, or revised decision may be reopened—
(a) Within 12 months of the date of the notice of the initial determination, for any reason;
(b) Within four years of the date of the notice of the initial determination if we find good cause, as defined in § 404.989, to reopen the case; or
(c) At any time if—
    (1) It was obtained by fraud or similar fault (see § 416.1488(c) of this chapter for factors which we take into account in determining fraud or similar fault);

The following provisions, 20 C.F.R. § § 404.992-404.994, provide the due process requirements for reopening of final decisions that satisfy the requirements of 42 U.S.C. § 405(b)(1) and constitutional due process. These reopening regulations thus provide the avenue for redetermining a disability claim in a defined set of circumstances, while still respecting *res*

*judicata* as demanded by 42 U.S.C. § 405(h) and affording due process to the beneficiary. They clearly require that, to justify a redetermination and not simply be relitigating the claim in violation of § 405(h), there must be more than the mere suspicion of the existence of fraud - it is the *actual* existence of fraud or similar fault, supported by substantial evidence presented to the impartial hearing tribunal, that is the necessary predicate for relitigating the final decisions of administrative law judges under the circumstances alleged herein. *Miranda, supra.*

There is no discernible reason why these reopening regulations would not serve perfectly as guidelines for the redetermination of disability called for by § 405(u). But is it the intent of 405(u), as Defendant argues, to ignore *res judicata* and set the reopening regulations aside in favor of some undefined but less demanding procedure? Actually, the answer is no.

**The Legislative History.**

Note how the terminology of the reopening regulation speaks of "fraud or similar fault" identical to that of  § 405(u). Surely this is not a coincidence.

Legislative history contained in a report of the Subcommittee on Oversight of the House Ways and Means Committee entitled "Report on Reforms to Address Supplemental Security Income Fraud and Abuse Involving Middlemen" [4] makes it clear that Congress intended proceedings under 42 U.S.C. § 405(u)  be undertaken using the process of reopening final decisions.[5] The report states in pertinent part:

---

4. See 140 Cong. Rec. H4750-03, H571, 1994 WL 274789

5 See Report on Reforms to Address Supplemental Security Income Fraud and Abuse Involving Middlemen, http://congressional.proquest.com/congressional/docview/t21.d22.cmp-1994-wam-0010?accountid=14740.

*To ensure Early Detection of SSI Fraud:*

The Social Security Act should be amended to require that the HHS IG make SSI "recipient identifying information" available to SSA as soon as it is known, and to **require that SSA immediately proceed administratively to reopen SSI cases** where there is reason to believe that an application or supporting documents are fraudulent, unless it is determined, in writing by a U.S. Attorney or equivalent State prosecutor with jurisdiction over potential or actually related criminal cases, that making the identifying information available to SSA or **proceeding with administrative reopening of those cases**, would substantially jeopardize the criminal prosecution of one or more of the parties involved in the related fraudulent scheme.

***To ensure the Reopening of SSI Cases** Where Fraud is Suspected:*

The Social Security Act should be amended to clarify **SSA's authority to reopen SSI cases where there is reason to believe that an application or supporting documents are fraudulent** and to expeditiously terminate benefits in those cases where SSA determines that there is insufficient reliable evidence of disability. . . .

Report at page 7 *[emphasis added].*

Thus, in addition to the meaning suggested by the placement of § 405(u) within the overall scheme of 42 U.S.C. § 405, we have the expression of the drafters themselves that supports the proposition that the reopening regulations are the vehicle for redeterminations.

**Agency Deference.**

Despite the foregoing, Defendant requests that the Court defer to her interpretation of 42 U.S.C § 405(u). She wants significant deference to her decisions about the process she created for actions taken under § 405(u), even though she didn't earn it by engaging in proper rulemaking as called for by 42 U.S.C § 405(a). Agencies don't get *Chevron* deference in all cases. In a case decided after the cases cited by Defendant in support of her position, the Supreme Court stated that "administrative implementation of a particular statutory provision

qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, *and* that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-227 (2001).   That almost exclusively involves agency interpretations advanced through "notice-and-comment rulemaking or formal adjudication." *Id.* at 230.   Here, Defendant has interpreted the statute through HALLEX I-1-3-25, specifically avoiding all notice-and-comment rulemaking requirements. As Defendant herself argues, HALLEX is clearly "best treated like interpretations contained in policy statements, agency manuals, and enforcement guidelines"—which do not get *Chevron* deference. Id. at 234.   (*Barnhart v. Walton*, 535 U.S. 212 (2002), is not to the contrary as that case involved a regulation promulgated through notice-and-comment rulemaking.).

That leaves *Skidmore* deference, which always applies but is not very much deference. "The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944).   With those factors considered, the Court should accord the Defendant's hastily-drawn, makeshift interpretation of the statute evidenced by HALLEX I-1-3-25 a minimum of deference.

C. **Defendant's interpretation of § 405(u) as expressed in HALLEX I-1-3-25 violates the Administrative Procedure Act's requirement that the adjudicator not "be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency."**

Defendant acknowledges that all findings and determinations regarding the existence of fraud or similar fault occurred within the Office of the Inspector General, were not subject to independent review by ODAR, and were not subject to any due process proceeding in which the beneficiary would see and be able to challenge the evidence relied on by OIG in reaching its conclusions about the predicate fact of fraud that launched the redetermination. The ALJ in Plaintiff's redetermination hearing also had no discretion to revisit the issue of whether the OIG's identified evidence should be disregarded when based on an OIG referral of information. Finally, under HALLEX I-1-3-25, Plaintiff may not appeal OIG's decision to conduct the redetermination or to disregard evidence.

OIG is thus given extraordinary power to adjudicate critical issues that may well determine the outcome of this process right at its outset.  This adjudication of issues occurs strictly off the record and clearly results in *ex parte* communication between OIG as the investigator and ODAR as the adjudicator in order to direct the admission and exclusion of evidence from the record. All of this is highly problematic.

The Office of the Inspector General is SSA's investigative branch. 5 U.S.C. § 554(d) requires that an absolute firewall be maintained between investigators and adjudicators performing their respective functions within an administrative agency such as the Social Security Administration. This firewall calls for clear delineation of function that separates investigative from adjudicative activities.

The drafting history of the APA addresses this issue of separation of investigative functions in a seminal report[6]  that explains the rationale behind 5 U.S.C. § 554(d):

> It is clear that when a controversy reaches the stage of hearing and formal adjudication the persons who did the actual work of investigating and building up the case should play no part in the decision. This is because the investigators, if allowed to participate, would be likely to interpolate facts and information discovered by them ex parte and not adduced at the hearing where the testimony is sworn and subject to cross-examination and rebuttal. In addition, an investigator's function may in part be that of a detective, whose purpose is to ferret out and establish a case. Of course, this may produce a state of mind incompatible with the objective impartiality which must be brought to bear in the process of deciding.

> These types of commingling of functions of investigation or advocacy with the function of deciding are thus plainly undesirable. But they are also avoidable and should be avoided by appropriate internal division of labor. . . . Creation of independent hearing commissioners insulated from all phases of a case other than hearing and deciding will, the Committee believes, go far toward solving this problem at the level of the initial hearing provided the proper safeguards are established to assure the insulation. A similar result can be achieved at the level of final decision on review by the agency heads by permitting the views of the investigators and advocates to be presented only in open hearing where they can be known and met by those who may be adversely affected by them.

*Final Report of the Attorney General's Committee on Administrative Procedure*, pages 55-56.

See *Grolier Inc. v. F.T.C,* 615 F.2d 1215, 1219 (9th Cir. 1980).

There is simply no convincing argument that can be made that the redetermination procedure established by Defendant in her HALLEX I-1-3-25 appropriately establishes the mandated firewall between the agency's Inspector General and its Appeals Council (that

---

6  In 1939 President Roosevelt "directed the Attorney General to name 'a committee of eminent lawyers, jurists, scholars, and administrators to review the entire administrative process in the various departments of the executive Government and to recommend improvements, including the suggestion of any needed legislation. The report of this committee became the blueprint for the APA and is "still a primary source of information about the federal administrative process." *Wong Yang Sung v. McGrath*, 339 U.S. 33, 38-39, 70 S.Ct. 445, 449, 94 L.Ed. 616, modified, 339 U.S. 908, 70 S.Ct. 564, 94 L.Ed. 1336 (1950).The committee's report is found at http://archive.law.fsu.edu/library/admin/pdfdownload/apa1941.pdf

supervises the ALJs in the performance of redeterminations). To the contrary, one can't tell where the investigator leaves off – if ever - and the adjudicator takes over.

Second, the APA requires that the administrative transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, "constitutes the exclusive record for decision". 5 U.S.C. § 556(e). "When an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary." Id. "A sanction may not be imposed or rule or order issued except on consideration of the whole record or those parts thereof cited by a party and supported by and in accordance with the reliable, probative, and substantial evidence." 5 U.S.C. § 556(d). There is nothing in Plaintiff's administrative transcript that sets forth whatever happened inside OIG that triggered her redetermination. The evidence that is said to have supported the decision is likewise missing from the transcript. And obviously Plaintiff was never given a chance to show the contrary.

Intermixing of investigative and adjudicatory functions, with a reliance on evidence not of record in the redetermination proceeding, is inescapable in the procedures established in HALLEX I-1-3-25, and the Star Chamber protocols by which Defendant proposes to conduct § 405(u) redeterminations just as inescapably violates the Administrative Procedure Act.

## VII.   CONCLUSION

There should be no doubt that Defendant failed to pursue immediately, promptly or diligently the investigation that at this very late date is leading to the present termination of Plaintiff's disability benefits. The United States Supreme Court has recognized that justice is best

promoted by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. "The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." *Bowen v. New York*, 476 U.S. 467, 481 n.13 (1986).

The prejudice to Plaintiff caused by these years of delay is extreme. Dr. Huffnagle, whose report is being stricken from the record in this case, died in 2010. While Defendant had four years to interview the doctor before he died, Plaintiff had no notice of allegations of impropriety, and therefore no reason to contact his expert witness after he won his case. As a direct result of Defendant's dawdling, Plaintiff now has no opportunity to rehabilitate his witness to rebut the allegations that evidence was somehow fraudulent. Additionally, as a practical matter, it is many years too late to secure new diagnostic development of and expert opinion about his medical condition as it existed years ago. Such opinion could be no more than speculative and lacking in credibility.

What the Supreme Court in *Bowen* warned against is exactly what has happened to Plaintiff. While there is no statutory limitation on redeterminations, there certainly ought to be consequences for the inexcusable failure to exercise its statutory mandate in a timely manner. This violation of the statute surely should provide some relief by which the prejudice to Plaintiff in this redetermination proceeding is recognized in fashioning a remedy that gives him a fair chance.

For the reasons set forth above, Plaintiff respectfully requests that his summary judgment be granted;  that the decision of the administrative law judge, which is dated April 4, 2007, be

reinstated as the final decision of the Commissioner; that the benefits previously awarded by that decision be reinstated; that he be granted injunctive relief, both preliminary and final, enjoining the Defendant from redetermining his entitlement to benefits previously adjudicated until such time as proper rules are promulgated by the Defendant that provide all rights, privileges and protections accorded to Plaintiff by the laws of the United States, including the Constitution of the United States, the Social Security Act, and the Administrative Procedure Act; and that he have such other and further relief as the Court may deem necessary and proper in the circumstances.

Respectfully submitted,

/s/ John O. Goss

John O. Goss Esq.
*Pro hac vice*
GOSS & FENTRESS, PLC
735 Newtown Road Suite 100
Norfolk, Virginia 23502
Telephone: (757) 466-1095
E-mail: ebowman@gossandfentress.com
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that, on November 7, 2016, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following file user(s):

> John S. Osborn, III
> Assistant United States Attorney
> Attorney for the Defendant
> Office of the United States Attorney
> 260 W. Vine Street
> Suite 300
> Lexington, KY  40507-1612
> Telephone: (859) 685-4812
> Facsimile: (859) 233-2533
> Email: John.Osborn@usdoj.gov

> /s/ John O. Goss
> _____
> John O. Goss Esq.
> *Pro hac vice*
> GOSS & FENTRESS, PLC
> 735 Newtown Road Suite 100
> Norfolk, Virginia 23502
> Telephone: (757) 466-1095
> E-mail: ebowman@gossandfentress.com
> Counsel for Plaintiff